2010 WY 146

**MULLINAX CONCRETE SERVICE CO., INC., Appellant (Petitioner),**

v.

Merlin H. ZOWADA and Lori Zowada, Appellees (Petitioners).

No. S–09–0237.

Supreme Court of Wyoming.

Nov. 10, 2010.

Representing Appellant: Anthony T. Wendtland of Wendtland & Wendtland, LLP, Sheridan, WY.

Representing Appellees: Harlan Rasmussen, Sheridan, WY.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Mullinax Concrete Service Co., Inc. (Mullinax), protested against a petition filed by the Appellees, Merlin H. and Lori Zowada (Zowadas), for the establishment of a private road across lands owned by Mullinax. The Sheridan County Board of County Commissioners (Commission or Board) approved a road other than the one which historically had been used by the Zowadas to access their property. That road crossed lands owned by Mullinax. Both the Zowadas and Mullinax sought review of the Commission's decision in the district court. The district court reversed the Commission's decision, in part, and remanded the case to the Commission for further proceedings. Mullinax now seeks review in this Court of the district court's order reversing the Commission's order. We will affirm the district court's order, in part, and remand to the district court with directions that it modify its order reversing and remanding as set out more fully below.

## ISSUES

[¶ 2] Mullinax raises these issues:

A. Substantial evidence was introduced into the record for the Commission to determine that the most reasonable and convenient location for the private road was the modified Industrial Drive option that was chosen and the Commission's findings adequately support that location.

B. Alternatively, the district court's order that a third set of appraisers and viewers must be appointed is incorrect and unworkable.

* Chief Justice at time of oral argument.

C. Alternatively, if the Commission's road location findings are remanded for further proceedings, the district court did not have authority to require the Commission to find that any location that the Commission settles on after remand must have BNSF consent for a right-of-way crossing.

The Zowadas restate the issues thus:

1. There was no evidence introduced into the record to support the [Commission's] location of the private road.

2. Mullinax's claims [of a] planned future use is not credible, was refuted, and should not be considered.

3. The findings and order of the district court are fully supported by the record.

4. There is sufficient evidence in the record for the Appellate Court to direct selection of the location of the private road as requested by the [Zowadas].

In its reply brief, Mullinax contends:

A. Zowadas cannot raise or argue an issue in this appeal that they lost before the district court and did not appeal to this Court (Issue 2, above).

B. Jurisdiction to complete any remand fact finding in this case rests solely with the [Commission].

C. Zowadas' new appendices C and H are not part of the record on appeal.

[¶ 3] We will not address issue C, immediately above, because this Court made no use of Appendices C and H in resolving this appeal.

## FACTS AND PROCEEDINGS

[¶ 4] The proceedings below were governed by Wyo. Stat. Ann. §§ 24–9–101 and 24–9–103 (LexisNexis 2005), and they bear directly on the resolution of the issues raised in this appeal. For purposes of ready reference, they are set out in APPENDIX A at the end of the opinion. Those statutes were changed quite significantly in 2007 and 2008. See Wyo. Stat. Ann. §§ 24–9–101 and 24–9–103 (LexisNexis 2009). However, our review will be guided by the earlier version of those statutes.

[¶ 5] On January 31, 2006, the Zowadas filed before the Commission a petition to establish a private road, in accordance with §§ 24–9–101 and 24–9–103. A very similar petition was filed on May 15, 2006, and it included a certificate of compliance alleging service on both Mullinax and the BNSF Railway Company (BNSF). By letter dated March 20, 2006, a representative for BNSF agreed "that the language contained in the deed [to Zowadas] does, in fact, indicate a continued right to use the crossing that they have been using for the past ten years." BNSF was represented in all the proceedings before the Commission, but it has not participated in either the appeal to the district court or in the appeal to this Court. In closing arguments before the Commission, BNSF made clear that its only concern, and its principal reason for participating in the proceedings, was to ensure that none of the options considered by the Commission included use of the roadbed, of the railroad's right-of-way, as a part of the private road to be allowed to the Zowadas (as opposed to merely crossing the railroad's right-of-way so as to use that portion of the private road that continued on the other side of the tracks). BNSF conceded that, to the extent the railroad bed needs to be crossed as a matter incidental to several of the road options placed in issue, the railroad bed and tracks are no longer in use and are not maintained (and that has been the case for several decades). BNSF figures in this appeal only because the district court included a mention of BNSF in its order reversing and remanding the Commission's decision to the Commission, for further proceedings there. We will address that more fully later in this opinion.

[¶ 6] Only Mullinax and the Zowadas are parties to this appeal, but there were several other parties below. That was so because six different routes were considered by the Commission, as well as by the Viewers and Appraisers appointed by the Commission in accordance with the governing statutes. "Route 1" is the route the Zowadas had used for 10 years or so prior to the inception of this litigation. The exact amount of time the Zowadas had used the road was disputed by Mullinax. However, whether the Zowadas'

use of the route was more or less than ten-plus years makes no difference to our resolution of this appeal. By order of the Commissioners the Zowadas have been permitted to continue to use that road since the inception of this litigation in 2006.

[¶ 7] "Route 1" was the route selected by the Viewers and Appraisers and recommended to the Commission. See APPENDIX B. "Route 2" was one of the alternative routes suggested by Mullinax and it would have funneled Zowadas' traffic through the parking/truck-operating area owned by Big Horn Beverage, Inc. "Route 2" was rejected by the Viewers and Appraisers, as well as the Commission, and that decision is not challenged in this appeal. "Route 3," which is immediately east of Big Horn Beverage's property and within 20 feet of Goose Creek, was also rejected and that is not challenged herein either. "Route 4" was rejected by the Viewers and Appraisers because it would have provided the Zowadas with access to their property from the east and north across undeveloped land owned by Mullinax. In addition, to the need for considerable road building, it would have been necessary for the Zowadas to build a bridge across Goose Creek from north to south. The rejection of that route is not challenged in this appeal. "Route 5" made use, in part, of an existing road called Industrial Drive, and then crossed lands owned by Mullinax as well as lands owned by N.A. and Ellen Nelson (Nelsons). The Nelsons made an appearance in writing and asked that a copy of the Viewers and Appraisers Report be sent to them. "Route 5" ultimately was rejected because of the difficulty of the terrain it traversed, and no issue is raised about that herein. Finally, what appears to be the longest route under consideration, "Route 6," was rejected by the Viewers and Appraisers because of its length and the probable cost of constructing a considerable portion of it across difficult terrain.

[¶ 8] As noted above, the Zowadas filed their initial petition for establishment of a private road on January 31, 2006. On February 16, 2006, Mullinax terminated the Zowadas' "temporary access" to use the road at issue as of 4:30 p.m., on February 20, 2006. The Zowadas filed a request for temporary

access on February 17, 2006, and the Commission granted them conditional temporary access by letter dated February 24, 2006.

[¶ 9] The Viewers and Appraisers were appointed as contemplated by the governing statute and those Viewers and Appraisers submitted their report to the Commission on December 18, 2006. The route they "suggested" was similar to "Route 6," described above, in that it included the use of Industrial Drive, but then it diverted the road onto the existing BNSF railroad bed. According to the viewers, this would allow Zowadas to remove the existing rails and ties from the railroad bed and create a roadway to their property. This report was rejected by the Commission out of hand because the Viewers and Appraisers had failed to follow the instructions given them by the Commission.

[¶ 10] New Viewers and Appraisers were chosen on June 26, 2007, and they were provided with instructions from the Commission. The record is clear that in this second go-around, the BNSF right-of-way could not be used for the proposed road itself (although crossing of the right-of way was acceptable). On October 2, 2007, the Viewers and Appraisers submitted their report to the Commission and selected "Route 1," described above, the route the Zowadas had historically used. The report included a before and after appraisal that assessed damages in favor of Mullinax in the amount of $4,500.00. The Viewers and Appraisers gave detailed explanations for their decision to reject Routes numbered 2, 3, 4, 5, and 6. Their explanation for choosing "Route 1" was this:

a. The present access has been in existence for an extensive period of time. See Deposition of Merlin Zowada, Thursday August 10, 2006 page 32, lines 19–23. "Q All right. How long have you been using the temporary access where it is across the Mullinax property either with the county commissioner letter or otherwise? And you can be—I mean roughly." "A At least 12, 13 years."

b. The Mullinax land containing the easement is on the extreme Eastern boundary of the Mullinax land and on

the boundary having the least dimension.

c. Any route changes examined show no *reasonable* alternatives. [Emphasis in original.]

d. Mullinax is contending that the access is required for a "storm water containment pond" which would apparently provide catchment for the entire property. Appendix J contains a letter from DEQ (Nov. 14, 2006) outlining rough requirements. Appendix G1 contains a drawing of a detention pond designed by Ronald Destafano P.E. which would be placed in the present access. The dimensions of the detention pond at the water line are approximately 85 feet long by 18 feet wide by 6 feet deep. We feel that there are alternate locations for this type of facility which would serve as well without disruption to the Zowada's longstanding access.

e. The strip of land required for the roadway is approximately 168 feet long, 24 feet wide and contains 4031 square feet. [617]

[¶ 11] In addition to this report of the private road recommended and the damages to be paid by the Zowadas to Mullinax, the Viewers and Appraisers made these recommendations: (1) That Zowadas be notified when the necessary periodic road maintenance for the hard surfaced portion of the road is required and that Zowadas pay 50% of the cost thereof; (2) That Zowadas maintain the gravel portion of the road at their cost; (3) The Zowadas' proposed security gate be implemented. This allows Zowadas to remain open on weekends which in turn reduces weekday traffic through Mullinax along the road; Zowadas to bear all costs associated with this gate; (4) That Zowadas be required to pay 50% of the redesign of a storm water facility to relocate the Mullinax storm water containment pond. Costs must be reasonable.

[¶ 12] A hearing was held before the Commission on November 7–9, 2007. In the Findings of Fact and Conclusions of Law signed by the Commission on December 24, 2008, the Commission made its decision. Of

significance in this appeal, the Commission did not establish the private road requested by the Zowadas and recommended by the Viewers and Appraisers. Rather, the Commission awarded them the route identified as "Route 6" above. Much of the content of the Commission's findings is given over to a summary of the procedural aspects of this very lengthy case, and we have further summarized those above. In Findings 34–37, the Commission concurs with the conclusions of the Viewers and Appraisers with respect to Routes 2, 3, 4, and 5. The Commission then goes on to declare "Route 1" as the most unreasonable and inconvenient route and "Route 6" as the most reasonable and convenient. We quote the remainder of the Commission's findings verbatim:

38. It is uncontroverted that Mullinax must comply with the Wyoming Department of Environmental Quality regulations regarding surface water discharge. It is likewise clear that the current method of addressing surface water discharge, involving the apparent permissive trespass into the Fort Road right-of-way and the use of hay bales to collect sediment, is ineffective.

39. The damages determined by the viewers and appraisers for the actual loss of value of the land subject to the easement ($4,500.00) is fair and reasonable and based upon valid sales comparisons.

40. In May 2008, the Commission was notified by counsel for John E. Rice & Sons, Inc. and Mullinax that Mullinax had purchased lands owned by John E. Rice & Sons, Inc. which lands lie north of Mullinax in and around the BNSF right-of-way. The Commission, as an adjudicatory body, takes notice of the transfer of ownership.

41. The Commission had not closed the evidentiary portion of the hearing previously and does so now.

42. The appraisal that was part of the viewers and appraisers report states on page 26 under *"Roadway Easement Acquisition:"*

"The easement area is asphalt surfaced with no other improvements present. The easement use will be restricted to use for access and no improvements can be placed in the area. extensive (sic) and

information, obtained from the Sheridan County Assessor, relating to the improvements, has been analyzed in order to determine what, if any, effect the road way easement will have on the physical and/or functional utility of the property. Based on the analysis, it is concluded that the use of the improvements will not be hindered by the easement and the improvements are not included in the valuation process, and only the land is considered in both the "before" and the "after" conditions."

The appraisal continues on page 27, *Effects of the Acquisition,* concludes that "[t]he use of the present improvements will not be inhibited by the easement and there are no perceived severance damages caused by the implementation of the roadway easement."

43. We believe that the viewers and appraisers are correct that current improvements will not be hindered or inhibited by an easement in the location of the current access enjoyed by Zowada. It is true that currently Mullinax has an ineffective system of managing storm water runoff. If the private road were located at the current access Mullinax would still have an ineffective system of managing storm water runoff. No better or worse than that currently enjoyed. Nevertheless, we believe that such a holding would deny Mullinax "just compensation" for the value of all property or property rights "lost or taken." Wyo. Constitution, Art 1, Sec. 33. *Mayland v. Flitner,* 28 P.3d 838 (Wyo. 2001). Currently Mullinax enjoys the right to place a retention pond at the eastern end of the property which, because it is the lowest point on the property, will catch storm water runoff and sediment. Currently, Mullinax may do so at a relatively inexpensive cost. However, if the private road is placed at the current place of access Mullinax loses that advantage the property affords. The retention pond may still be constructed in that location but no longer at the same economical cost. It would necessitate construction at a considerably greater cost to permit it serving both retention pond and private road. *In*

*re Crago,* 168 P.3d 845, [855] fn. 5 (Wyo. 2007).

44. Under the private road statutes there are two means of attempting to address this issue. One is IN [sic] considering the loss to Mullinax in ascertaining damages. In *Lindt v, Murray,* 895 P.2d 459, [463] (Wyo.1995) and *R.C.R. Inc. v. Deline,* 70 P.3d 214, [221] (Wyo.2003) the Wyoming Supreme Court cited *Mettee v. Kemp* [236 Kan. 781], 696 P.2d 947, [949] (Kan.1985) as articulating various factors which may be considered in determining damages. It would seem that the loss of convenience or use, the potential effective taking of additional land to meet the runoff need, the loss of this profitable use are each consistent with factors listed in *Mettee.* A second method of addressing this loss to Mullinax is by way of the "reasonable and convenient" analysis that is required of this Commission in determining the location of a private road. As we have indicated earlier, some alternative routes have been discarded because they were not economical or practical for Zowada. The applicants proposed route may likewise be rejected as impractical, uneconomical and not being "located so as to do the least possible damage to the lands through which the private road is located." W.S. 24–9–101(h). This would appear consistent with the practical, common sense approach apparently contemplated by the statute.

45. The viewers and appraisers concluded that the "most reasonable and convenient" route under the circumstances was the current access. That conclusion was arrived at because the current access had been used for a number of years, was the shortest in length, made use of the existing railroad crossing, involved crossing only one land owner's property and, according to their computation of damages, resulted in the least amount of damages to the Mullinax property. As we have already stated, we believe that computation of damages to have failed to fully account for the actual property or property rights "lost or taken."

46. Mr. Evans and Mr. Destafano's testimony was in agreement that an effective means of addressing storm water dis-

charge and accompanying sediment and other runoff is by way of a sediment retention pond. A sediment retention pond with the capacity needed also appears to be the most economical. Mr. Destafano estimated the cost of such a pond at less than $10,000.00. This amount is also consistent with the estimate cost for excavation contained in Exhibit Mull 110 of $9,000.00.

47. In consideration of damages, the loss occasioned by Mullinax might well be measured as the sum of the actual value of the land lost as determined by the viewers and appraisers ($4,500.00), plus the cost of the alternative methods suggested minus the estimated cost of the excavated retention pond which cost Mullinax would have incurred in any event. ($10,000.00).

48. It also appears uncontroverted that the best location for a sediment retention pond is at the east end of the Mullinax property. The east end of the Mullinax property is also the current location of a number of other improvements to the property that are integral to the commercial operation occurring there, including, but not limited to, the weight scales.

49. Other means of remedying the storm water issue were suggested by various witnesses and counsel. Each of them raise[s] issues regarding their effectiveness and the cost. For example, it has been suggested that the retention pond could be built at the current access point with the retention pond being bridged. However, the retention pond bridge would require more concrete for stability, necessitating slightly more excavation to accommodate the capacity identified by Mr. Destafano and agreed to by Mr. Evans. The bridge itself would need to be removable to permit cleaning of sediment and silt as described by Mr. Destafano. The only figures regarding the cost of such a structure were provided by Nathan Mullinax. Exhibit Mull 110, page 1. Nathan Mullinax estimated a total cost of $424,775.25. We would reduce that estimate of cost $118,000.00. That reduction represents our conclusion that the temporary private entrance, general contractor fees and design and engineering costs would either be incurred by Mullinax or performed by Mullinax in any event. Subtracting the cost of the simple retention pond ($10,-000.00) and adding the cost of the land subject to the private road easement ($4,500.00) would result in damages totaling $301,275.00. No damages for costs of yearly maintenance would be assessed as maintenance would be required by any method including the basis of the retention pond.

50. The only other method for which any cost figures have been provided is for the use of various tanks. This does not appear to be precisely the method suggested by Mr. Mentock during his testimony and for that reason might well have been rejected except that the costs are less than those for the bridge option. Given that they are less, they will be considered here. The total construction cost, again provided by Mr. Nathan Mullinax, [Exhibit Mull 110, page 2] is $407,575.00. We will subtract $109,140.00 for the temporary private entrance, etc., that we subtracted in the prior finding and subtracting the cost of the basic retention pond but adding the actual land cost would indicate total damages in the amount of $292,935.00. The consideration of such factors as damages are appropriate in appraising the value of the property and any subsequent loss before and after the road is in place.

51. The highest and best use as found by the viewers and appraisers is as a commercial or industrial building site.

52. The Commission concludes that the route of the private road proposed by Zowada is not reasonable or convenient for Mullinax nor would it do the least damage to the land on which it is located.

53. The Commission finds that at the time of the contested case hearing, November 7-9, 2007, the Industrial drive route crossed the land of three separate landowners.

54. The Commission finds that the Industrial Route is the most reasonable and convenient to both Zowada and Mullinax and is located to do the least possible damage to the Mullinax property. Mr.

Evans testified that the estimated cost of that route may be $100,000.00. As testified by Mr. Evans this is one of the longer routes proposed, however, as he also testified there is little in the nature of fill or cut work that will be required. The Commission also notes that no crossing of Big Goose Creek is required.

55. The Commission finds that the Industrial Drive route utilizes a private access easement used by three other landowners in that area.

56. The Commission chooses to modify the Industrial Drive route in the following manner: the roadway shall be 24 feet in width and shall run north from Fort Road on the Industrial Drive north past .the BNSF right-of-way; the road shall cross the BNSF right-of-way at a location agreeable to BNSF; thereafter, the road shall curve eastward along a line roughly parallel to the BNSF right-of-way until it terminates at the Zowada property. At all times the road shall remain on lands owned by Mullinax.

57. The Commission is not convinced that if the right-of-way were located as proposed by Zowada, the amount of costs incurred by Mullinax to construct an effective alternative to the simple retention plan as a result, could not be constructed for a lesser amount. However, those estimates are the only evidence of cost of the various alternatives presented. In any event, it appears clear that such cost would be significant and likely to cost an amount comparable to the value of the land utilized as the easement from the Industrial Drive and of construction of a road in that location.

58. The Commission therefore finds that the damage to Mullinax is $0.00. The testimony of Nathan Mullinax suggested and the Commission finds that for Mullinax the value of constructing the basic storm water retention pond at the east end of their property without further cost or disruption to operations at that end of the property is equal to the value of the actual property subject to the easement if such easement runs east from Industrial Drive roughly parallel to the BNSF right-of-way.

Conditions of usage. The following conditions of usage are placed upon the road and its use:

1. Mullinax shall grant to Zowada permission to place 1 unlit sign of up to 24 square feet in size at the access to Industrial Drive and 1 unlit sign of up to 24 square feet in size at the curve leaving Industrial Drive and proceeding eastward to direct Zowada traffic.

2. Mullinax shall afford Zowadas and its invitees access via Industrial Drive 24 hours each day, seven days a week.

3. Zowada shall be responsible for obtaining and paying engineering and construction costs incurred concerning the location and construction of the road in accordance with these findings.

4. The costs in this matter are $13,437.46, which has been paid by Sheridan County and should be assessed to Zowada.

5. That Zowada shall pay for a survey and mark the road on the Mullinax property.

6. Upon presentation of proof of payment of all costs and damages there shall be caused to be filed with the Sheridan County Clerk a plat of the survey as commissioned by Zowada for the establishment of the private road.

7. Zowada shall be solely responsible for all upkeep and maintenance on the extension of the Industrial Drive running east and west once the road is constructed.

[¶ 13] Zowadas filed a petition for review in the district court as provided for in W.R.A.P 12.03; and see Wyo. Stat. Ann. § 16–3–114 (LexisNexis 2009). Mullinax also filed such a petition. The Zowadas raised these issues: (1) Whether the location for the private road selected by the Commission was supported by substantial evidence; and (2) Whether the Zowadas' due process rights were violated when the Commission considered Mullinax's purchase of neighboring property after the close of proceedings. Mullinax questioned whether the Commission applied the correct standard in determining damages and compensation due to Mullinax. The district court's decision letter resolved the issues raised as follows:

**The Location of the Private Road**

Zowadas argue that the location selected by the Board for the private Road was not supported by substantial evidence. In making their final decision, the Board reviewed the viewers and appraisers' report and then made their decision, locating the road in a location that was not suggested by either party or the viewers and appraisers.

While W.S. 24–9–103(a) gives a board the power to either "accept, reject or modify the report and recommendations' of the viewers and appraisers, the board must still "select the most reasonable and convenient route for the access, provided that access shall be along section and boundary lines whenever practical." The evidence in this case overwhelmingly indicates that the Board did not place the road in a location that was "reasonable and convenient." The Board did not consider the objections of BNSF in which they claimed they still had an ownership interest in the right-of-way and would not allow a crossing in the area selected by the Board. *Second Viewers and Appraisers Report* Section 2d., October 2, 2007. While the Board rejected the report of the first set of appraisers, it is clear from the first report that the Board placed the road in a location where the first set of appraisers explicitly stated it should not be placed based on the challenges of dealing with the topography. *First Viewers and Appraisers Report* pp. 1–2, December 29, 2006. The Board considered Mullinax's claims that it was necessary to move the Zowadas' access from where it currently [was], and had been for a significant amount of time, ... to another location[, was] because Mullinax needed the land for a retention pond. This was in conflict with the viewers and appraisers' report which indicated the pond could be located in other areas. *Second Viewers and Appraisers Report* section 3, p. 3, October 2, 2007. These are just a few of the factors that indicate the Board's decision to locate the road where it did was not supported by substantial evidence in this case. Furthermore, there is no evidence in the Board's findings of facts that indicate why the Board thought this location was more reasonable and convenient than the other suggested locations. Therefore, this case is remanded to the Board to locate the road in a place that is "reasonable and convenient."

[¶ 14] The Zowadas argued that their due process rights were violated because they did not have a chance to respond when Mullinax informed the Board that they had purchased the Rice property upon which a portion of "Route 6" was located. The district court concluded that this did not constitute a denial of due process under the unusual circumstances of this case, and we agree with that conclusion.

[¶ 15] With respect to Mullinax's assertion that the award of damages was erroneous, the district court agreed. Finally, the district court directed that this case be reversed and remanded to the Board with directions that it re-assemble the Viewers and Appraisers in order that the following tasks could be accomplished:

1. Assess the damages for ALL possible road locations,

2. Calculate the damages on the date of the viewing of the affected real property and considering the circumstances that exist at the time of viewing, and

3. Use a before and after assessment to calculate the damages.

Continuing the district court directed the Board to specifically determine and state:

1. Why the location of the road is reasonable,

2. Why the location of the road is convenient,

3. If the location selected will require the road to be built at a greater cost, why such cost is justified, and

4. Whether or not BNSF consents to a crossing at that location.

**DISCUSSION**

**Standard of Review**

[¶ 16] We apply our usual standard of review rule in Rule 12 cases. As set out in *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶¶ 21–23, 188 P.3d 554, 561 (Wyo.2008):

Section 16–3–114(c)(ii) provides only one evidentiary standard of review. Under the plain language of the statute, reversal of an agency finding or action is required if it is "not supported by substantial evidence." Because contested case hearings under Wyoming's Administrative Procedures Act are formal, trial-type proceedings, use of the substantial evidence standard for review of evidentiary matters is more in keeping with the original intent of the drafters of the administrative procedures act. 33 Fed. Prac. & Proc., Judicial Review §§ 8333, 8334.

Thus, in the interests of simplifying the process of identifying the correct standard of review and bringing our approach closer to the original use of the two standards, we hold that henceforth the substantial evidence standard will be applied any time we review an evidentiary ruling. When the burdened party prevailed before the agency, we will determine if substantial evidence exists to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. See, *Wyo. Consumer Group v. Public Serv. Comm'n of Wyo.*, 882 P.2d 858, 860–61 (Wyo.1994); *Spiegel*, 549 P.2d at 1178 (discussing the definition of substantial evidence as "contrary to the overwhelming weight of the evidence"). If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

The arbitrary and capricious standard remains a " "safety net" to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *Newman [v. State ex rel. Wyo. Workers' Safety & Comp. Div.* ], ¶ 23, 49 P.3d [163] at 172 [ (Wyo.2002) ]. Although we explained the "safety net" application of the arbitrary and capricious standard in *Newman*, we will refine it slightly here to more carefully delineate that it is not meant to apply to true evidentiary questions. Instead, the arbitrary and capricious standard will apply if the hearing examiner refused to admit testimony or documentary exhibits that were clearly admissible or failed to provide appropriate findings of fact or conclusions of law. This listing is demonstrative and not intended as an inclusive catalog of all possible circumstances. *Id.*

Also see *Anderson v. Board of County Commissioners*, 2009 WY 122, ¶ 10–12, 217 P.3d 401, 404–5 (Wyo.2009) (we note that the reference in ¶ 11 to "It is more than a scintilla of evidence," is erroneous and is a part of the older *Newman* standard that we replaced with *Dale* ).

[¶ 17] Zowadas had the initial burden to establish that their land had no outlet to a convenient public road. It is not questioned in this appeal that the Zowadas met that burden. The standard of review set out above instructs us that we need to apply the pure form of the substantial evidence test here. That is so because with respect to the question of which route was "the **most** reasonable and convenient route for the access" the governing statute does not assign the burden of proof on that point to either party. Indeed, § 24–9–101(g) provides that all affected parties may be heard, and the County Commissioners' decision must be supported by substantial evidence winnowed from those proceedings. Although this may not be true for all private road cases, here we conclude that the arbitrary and capricious standard also applies because the Commission ren-

dered a decision which "cannot be easily categorized." *Dale*, ¶ 23, 188 P.3d at 561.

[¶ 18] Our review is most directly aimed at the district court's order, which we will affirm at least in part. However, we also discern errors in the directions given by the district court for the remand and we will direct the district court to remedy those errors in a revised order reversing and remanding the Commission's decision. We begin our part of this decision-making process by noting again that we examine the record on appeal to ascertain if substantial evidence exists in the record on appeal to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. We conclude that there is not substantial evidence to support the Commission's conclusion that "Route 6" was the *most* convenient and reasonable route, when the competing interests of Mullinax and Zowada are considered side-by-side, rather than in an individualized and isolated consideration of their competing interests. From Mullinax's standpoint "Route 6" may be "wildly" superlative, but from Zowadas' standpoint it is all but confiscatory. A hallmark of private road cases has always been that convenience and reason should prevail in the establishment of private roads, but the route chosen does not have to be the most convenient and reasonable route possible. *Mayland v. Flitner*, 2001 WY 69, ¶ 13, 28 P.3d 838, 843 (Wyo.2001). The Commissioners and the Viewers and Appraisers eliminated all but "Route 1" and "Route 6" from consideration as potentially convenient and reasonable private roads.

[¶ 19] We agree with the district court that the Commission's decision to select Route 6 must be reversed because there is a lack of substantial evidence in the record to support the Commission's decision. The Commission did not articulate a sound factual basis for choosing Route 6, which appears to be quite inconvenient for the Zowadas due both to its length as well as the cost of creating much of the road on virgin pastureland. Moreover, there is a lack of evidence as to what its actual cost might be. The transcript and the Commission's findings in-

dicate that the estimated $100,000.00 cost to finish the road was, at best, a "guesstimate," rather than an actual appraisal or formal estimate. In addition, the record indicates, but does not establish as a matter of fact, that the road would exceed the amount the Zowadas paid for the land to which they seek access.

[¶ 20] In addition to the lack of evidence to support selection of Route 6, we believe that the Commission's decision that Mullinax was not entitled to any damages for that portion of Route 6, which crosses the land that Mullinax purchased from the Rice Ranch after the hearing was concluded, but before the Commission reached its decision, was incorrect. The Commission should have required a before and after values analysis. There is no evidence in the record on which to base such analysis, which in and of itself, amounts to a lack of substantial evidence and, arguably, makes the decision arbitrary and capricious. The Commission disagreed with the Viewers and Appraisers assessment that Route 1 was the most reasonable and convenient route. However, it appeared the Commission based its decision on the conclusion that Mullinax would be deprived of the right to use that location for its sediment pond. The Commission did not address the Viewers' and Appraisers' other observations, including that Route 1 was the historical access, was by far the shortest, used an existing railroad crossing, involved crossing only one landowner, and was located on a boundary line. We believe the Commission's failure to weigh these factors was error.

[¶ 21] We also conclude that the Commission's analysis of the facts relating to the sediment pond was insufficient. First it should have made findings about the DEQ's requirements for such a pond and the deadline, if there was one, for having it in place. In Finding No. 38, the Commission stated:

38. It is uncontroverted that Mullinax must comply with Wyoming Department of Environmental Quality regulations regarding surface water discharge. It is likewise clear that the current method of addressing surface water discharge, involving the apparent permissive trespass into the Fort

Road right-of-way and the use of hay bales to collect sediment is ineffective.

In Finding No. 43, the Commission states:

43. ... Currently Mullinax enjoys the right to place the retention pond at the eastern end of the property which, because it is the lowest point on the property will catch storm water runoff and sediment. Currently, Mullinax may do so at a relatively inexpensive cost. However, if the private road is placed at the current access Mullinax loses that advantage the property affords. The retention pond may still be constructed at that location but no longer at the same economical cost. It would necessitate construction at considerably greater cost to permit it serving as both retention pond and private road....

[¶ 22] As noted above in Findings numbered 48–50, the Commission considered alternatives for Mullinax's storm water issues, including building the pond where Mullinax wanted it, but bridging it, or using tanks instead of a pond. The Commission concluded that both of those options were too expensive. However, it did not address the fact that the Viewers and Appraisers specifically stated that there were other places where the pond could be built. There was disputed evidence about this at the contested case hearing. One engineer testified that the pond could be placed elsewhere for approximately the same cost as constructing it at the Route 1 location, whereas Mullinax testified that it could not be placed elsewhere without disrupting Mullinax's business operations. The Commission did not resolve this dispute and does not appear to have considered this option at all. It was the Commission's duty as fact finder to assess the credibility of the witnesses, including that of the Viewers and Appraisers, and weigh the evidence to determine whether the pond could be constructed elsewhere and what the cost would be.

[¶ 23] We are compelled to conclude that the Commission did not make adequate findings of fact, comparing the relative costs and benefits of Routes 1 and 6. Therefore, we remand this matter to the district court with directions that it modify its order remanding this matter to the Commission as follows:

1. The Commission need only compare the relative merits of Routes 1 and 6 in light of the circumstances in which *both* of the parties will be left.

2. If Route 6 is ultimately chosen, the Commission must fully consider why the greater costs of that road are justified. It must also obtain a before and after appraisal to consider in any award of damages to Mullinax.

3. There is no need to obtain further consent from BNSF.

The Commission may opt to take additional evidence in order to meet these requirements, but should be able to do so without the need to appoint new Viewers and Appraisers.

## CONCLUSION

[¶ 24] The order of the district court remanding to the Commission for further proceedings, as modified above, is affirmed. This matter is remanded to the district court with directions that it further remand it to the Commission for additional proceedings consistent with this opinion.

## APPENDIX A

§ 24–9–101. **Petition; initial hearing; appointment of viewers and appraisers; bond; rules.**

(a) Any person whose land has no outlet to, nor connection with a public road, may file an application in writing with the board of county commissioners in the county where his land is located for a private road leading from his land to some convenient public road. The application shall contain the following information:

(i) The legal description of the land owned by the applicant to which access is sought and a statement that the land is located within the county;

(ii) A specific statement as to why the land has no legally enforceable access, other than a waterway, and whether the land is surrounded on all sides by land owned by another person or persons or a natural or manmade barrier making access unreasonably costly;

(iii) A description of the applicant's efforts to purchase a legally enforceable access to a public road;

(iv) A description sufficient to identify the general location of any access routes proposed by the applicant;

(v) The legal description and the names and addresses of the affected parties of all land over which any proposed access routes would cross. Affected parties includes the owners of record, owners of recorded easements and rights of way and any lessee, mortgagee or occupant of the land over which any proposed road would cross and may include the state of Wyoming; and

(vi) A statement as to whether any actions of the applicant or any person with the consent and knowledge of the applicant, caused the applicant's land to lose or to not have any legally enforceable access.

(b) Within ten (10) days after filing an application with the board, the applicant shall give notice in writing by certified mail, with return receipt, to the affected parties of all lands over which any private road is applied for, of his pending application for a private road. The notice shall include a complete copy of the original application and any amendments thereto.

(c) The board shall review the application within thirty (30) days of its receipt and if the board finds the application contains the information required by subsection (a) of this section and notice has been provided in accordance with subsection (b) of this section, it shall schedule a hearing to determine whether the applicant has no legally enforceable access to his land. The hearing shall be scheduled at a date that allows the applicant time to give all notice required under this section.

(d) If the applicant has had access to his land and that access is being denied or restricted, the board of county commissioners may grant temporary access to the applicant over a route identified by the board until the application has been processed and finalized.

(e) After the board has scheduled a hearing date under subsection (c) of this section, the applicant shall give written notice of the date, time and place of the hearing on the application, by certified mail with return receipt, to all affected parties named in the original application and any other landown-ers the board believes may be affected by the application or any alternative route which may be considered by the board or the viewers and appraisers. The written notice shall include a copy of the original application and any amendments thereto and shall be provided at least sixty (60) days prior to the pending hearing. If any affected party is a nonresident, and there is no resident agent upon which personal service can be had, then the notice may be published once a week for three (3) weeks in a newspaper published in the county. The first publication shall be at least sixty (60) days prior to the hearing.

(f) The board may assess to the applicant costs for acting on the application under this section and W.S. 24-9-103 and require the applicant to file a bond to pay for those costs.

(g) All affected parties having an interest in the lands through which the proposed road or any alternative road may pass may appear at the hearing and be heard by the board as to the necessity of the road and all matters pertaining thereto.

(h) If at the completion of the hearing the board finds that the applicant has satisfied the requirements of this section and access is necessary because the applicant has no legally enforceable access, the board shall appoint three (3) disinterested freeholders and electors of the county, as viewers and appraisers. Before entering upon their duties the viewers shall take and subscribe to an oath that they will faithfully and impartially perform their duties under their appointment as viewers and appraisers. The board shall cause an order to be issued directing them to meet on a day named in the order on the proposed road, and view and appraise any damages and make a recommendation to the board. Prior to meeting on-site to view the proposed road, the viewers shall give notice in writing to the applicant and affected parties of the lands through which the proposed road or any alternative road may pass, of the time and place where the viewers will meet, at least ten (10) days before viewing the road, at which time and place all persons interested may appear and be heard by the viewers. The viewers and appraisers shall then proceed to locate and mark out a private road and alternative routes as they deem appropriate, provided the location of the road shall not be marked out to cross the lands of any affected party who was not

given notice under subsection (e) of this section. *The viewers and appraisers shall recommend the most reasonable and convenient route, provided that access shall be along section and boundary lines whenever practical. The viewers and appraisers may recommend specific conditions that the board place on the road as the board deems necessary, including provisions for maintenance and limitations on the amount and type of use. The proposed road* shall not exceed thirty (30) feet in width from a certain point on the land of the applicant to some certain point on the public road, and *shall be located so as to do the least possible damage to the lands through which the private road is located.* The viewers and appraisers shall also appraise any damages sustained by the owner over which the road is to be established and make full and true returns, with a plat of the road to the board of county commissioners. *The viewers and appraisers shall also determine whether or not any gates* or cattle-guards *shall be placed at proper points on the road, and appraise any damages in accordance with that determination.*

(j) In determining any damages to be suffered by the owner or owners of the lands through which the access shall be provided, the viewers and appraisers shall appraise the value of the property before and after the road is in place. Damages also may include reasonable compensation for any improvements on the lands over which any private road is to be granted which were not paid for and will be used by the applicant.

(k) All hearings under this section and W.S. 24–9–103 shall be held in accordance with the Wyoming Administrative Procedure Act, as it applies to a contested case. The board shall enforce the provisions of this article in accordance with the Wyoming Administrative Procedure Act. [Emphasis added.]

§ 24–9–103. **Report of viewers and appraisers; second hearing; order by commissioners; appeal.**

(a) The viewers and appraisers so appointed, or a majority of them, shall make a report of their recommendations to the board of county commissioners at the next regular session, and also the amount of damages, if any, appraised by them, and the person or persons entitled to such damages. Upon receiving the report of the viewers and appraisers, the board shall hold a hearing after twenty (20) days prior written notice to all affected parties having an interest in the lands through which the proposed road or any alternative road may pass, at which time the affected parties may address the report. *The board may either accept, reject or modify the report and recommendations. The board shall select the most reasonable and convenient route for the access, provided that access shall be along section and boundary lines whenever practical.* In compliance with the Wyoming Administrative Procedure Act, the board shall issue an order specifying the route selected by the board, any conditions imposed by the board and any damages and costs to be paid by the applicant.

(b) The applicant and any other person aggrieved by the action of the board including the amount of any damages awarded, may appeal to the district court at any time within thirty (30) days from the date of the order.

(c) After the board of county commissioners has received proof of payment by the applicant of any damages and costs ordered to be paid, the board shall cause a certified copy of the order to be filed with the register of deeds declaring the road to be a private road, and citing in the order any conditions imposed by the board.

(d) In addition to paying any damages to be suffered by the affected parties having an interest in the land through which the access shall be provided, the applicant shall be responsible for obtaining and for paying for any engineering and construction costs incurred concerning the location and construction of the road.

(e) If the proposed private road is located in two (2) or more counties, or if all parties and the board of county commissioners so stipulate, the applicant may bring a private road action in district court in the county where any of the affected lands are located. [Emphasis added.]