# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 31

### OCTOBER TERM, A.D. 2013

_____February 27, 2014_____

IN THE MATTER OF THE
WORKER'S COMPENSATION
CLAIM OF:

DON BIRCH,

Appellant
(Petitioner),

v.                                                                  S-13-0132

STATE OF WYOMING ex rel.
WYOMING WORKERS' SAFETY
AND COMPENSATION DIVISION,

Appellee
(Respondent).

---

*Appeal from the District Court of Sweetwater County*
*The Honorable Nena James, Judge*

*Representing Appellant:*
F. Gaston Gosar of F. Gaston Gosar, P.C., Pinedale, Wyoming

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; Samantha Caselli, Assistant Attorney General

*Before KITE, C.J., and HILL, VOIGT,\* BURKE, and DAVIS, JJ.*

*\* Justice Voigt retired effective January 3, 2014*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**DAVIS**, **Justice**.

[¶1]    Appellant Don Birch sought reimbursement for travel expenses related to chiropractic treatment he received at the Utah Spine and Disc Clinic in Murray, Utah from the Wyoming Division of Workers' Compensation (Division).  Mr. Birch lived in Daniel, Wyoming.   The Division denied his request for reimbursement because traditional types of chiropractic care, manipulation and traction could have been obtained at a location in Wyoming closer to his home, and because cold laser therapy was considered experimental and was therefore not a covered treatment for which the Division would pay travel expenses.  We affirm.

## ISSUES

[¶2]    We will attempt to clarify the three issues Mr. Birch presents by restating them as follows:

> 1.  Are the hearing examiner's findings sufficient to support his determinations (a) that travel expenses relating to cold laser therapy should not be reimbursed because that therapy is experimental and not compensable, and (b) that no travel expenses relating to any of the treatment received in Utah should be reimbursed because comparable conventional chiropractic treatment could have been obtained in Wyoming closer to Mr. Birch's home?
>
> 2.  Does substantial evidence support those findings?
>
> 3.  As a matter of law, should the hearing examiner have awarded travel expenses relating to manual chiropractic manipulation and mechanical traction as if those services were provided in Rock Springs rather than Utah?

## FACTS

[¶3]    The uncontested background of Mr. Birch's case is succinctly set out in the hearing examiner's "Findings of Fact, Conclusions of Law, and Order":

> Birch was originally injured in 1975 while working for FMC.  Birch's injuries resulted in the amputation of his right

1

leg, below the knee.[1]  The Division opened a case and over the ensuing years paid a number of benefits.  In the 1990s, B[i]rch began experiencing low back pain which was determined [to] have resulted from the altered gait from years of wearing a prosthetic leg.  In 2009, Birch sought preapproval for a spinal fusion of his lumbar spine; initially the Division denied the preauthorization but later withdrew its protest.  Ultimately, Birch elected not to proceed with the spinal fusion and began to research alternative treatment options.  Birch's research led him to the Utah Spine and Disc Clinic (Utah Spine and Disc) in Murray, Utah where he sought chiropractic treatment, including cold laser therapy.  Birch sought reimbursement for travel to and from Utah Spine and Disc and on March 11, 2011, the Division issued a Final Determination denying reimbursement for travel because there are medical providers closer to Birch's home and because the Division considers cold laser therapy to be non-covered experimental or investigational treatment.[2]

Mr. Birch also received more common forms of chiropractic treatment, including adjustment and traction, in Utah.

[¶4]   Mr. Birch testified at the ensuing telephonic administrative hearing, and he submitted over two hundred pages of documents, including the deposition of Dr. Brett Luddington, the chiropractor who supervised his treatment at the Utah clinic.  Among other documents which will be addressed in more detail below were promotional materials generated by the treatment provider and the manufacturer of the device used on Birch, both of which not surprisingly extolled the treatment benefits of Class IV cold lasers.  He also submitted articles that addressed chiropractors' increased use of therapeutic cold lasers and reports of studies on their efficacy.

[¶5]   Birch attempted to establish the following in the OAH hearing:  1) that therapeutic lasers produce beneficial effects by directing light in the infrared range through the body to targeted tissues, thereby stimulating light sensitive cellular chemicals to initiate a series of salutary chemical reactions; 2) that Class IV therapeutic lasers like that used to treat him in Utah are superior to Class III therapeutic lasers because the higher energy

---

[1] Birch testified that the leg was amputated above the knee, but other record evidence indicates the amputation was a modified knee disarticulation, that the upper and lower portions of his leg were separated at the knee joint.

[2] Birch took out a substantial loan from a financing organization affiliated with the Murray clinic to pay for the treatment he received.  He did not seek preapproval of the treatment from the Division, and the record contains no application for reimbursement for the chiropractic or laser therapy itself.

output of the former allows deeper penetration and less scattering of the laser beam, and shortens treatment times; 3) that studies have shown a variety of benefits from therapeutic laser treatment; and 4) that the Class IV laser with which Birch was treated was approved by the United States Food and Drug Administration (FDA).

[¶6]    Dr. Luddington's deposition testimony concerning laser therapy generally parroted his employer's and the manufacturer's promotional material, with few references to the details of the scientific studies he claimed found it to be effective.  The manufacturer's claims and Dr. Luddington's testimony were at odds with other exhibits that Birch submitted, however.  For example, both asserted that therapeutic lasers reduce pain by using the light itself to induce a series of chemical reactions in the cells of targeted tissues, not by generating heat in the tissue with the laser.  On the other hand, Birch's Exhibit 10 characterized that theory as hypothetical and in need of further experimental studies to demonstrate its efficacy.[3]  Furthermore, Exhibit 14, a letter from the FDA to the manufacturer of the laser used on Birch, approved marketing of the device as the substantial equivalent of an infrared heat lamp.[4]

[¶7]    The remaining scientific articles submitted by Birch also did little to advance his cause.  Exhibit 7, for instance, noted that the medical research community remains skeptical and unable to reach firm conclusions about the "mechanism of action and effectiveness" of therapeutic lasers due to insufficient data or conflicting findings.  It then recounted the authors' statistical analysis of sixteen clinical studies involving a total of 820 patients who were treated with Class III lasers and placebo "lasers" for non-specific neck pain of unknown etiology.  In some cases, that treatment was supplemented by exercise therapy and analgesic drugs.  The study concluded there was only moderate statistical evidence for the short and medium term effectiveness of laser treatment for neck pain, and conceded that the mechanism by which a laser may reduce pain remains unknown.

[¶8]    Exhibit 8 summarized a small study in which twenty-one patients with lower back pain were treated with chiropractic manipulation and exercise therapy, and twenty-four patients with similar complaints received Class IV laser therapy in addition to manipulation and exercise.  The second group self-reported greater pain reduction than

---

[3] The studies discussed in this scholarly paper related to the use of lasers, having an output consistent with Class III  lasers, to enhance the natural regeneration of injured facial nerves in rats and *in vitro* laser radiation of nerve cells.  Due to those limitations, the paper did not deal at all with the effect of lasers on tissues more than a superficial distance below the skin.

[4] Birch advanced the notion that, for the reasons stated by the manufacturer, his Class IV laser therapy in Utah was distinctly more beneficial than the Class III laser therapy he could have obtained in Rock Springs, due to the proven enhanced ability of the former to induce photo-chemical reactions in deep tissue.  However, he also took the position that Class IV lasers were not experimental simply because that mechanism of pain relief was proven and well established, but also, contrary to the manufacturer's claims, that all therapeutic lasers provide the same mechanism as conventional infrared heat lamps.

the first, but no placebo laser control was used in the study, and it did not attempt to isolate the effect of laser therapy when used with other treatment modalities. Consequently, the author conceded that further study was required to validate his provisional findings.

[¶9]   The Division relied primarily on the deposition testimony of Dr. Daniel Staight. Dr. Staight is a chiropractor with some specialized chiropractic training in orthopedics. He served on the Division's chiropractic review panel for nine years, and he also chaired a number of committees of the American Chiropractic Association. He concluded, as had the review panel, that the use of therapeutic lasers was an experimental or investigatory procedure which should not be compensable under Wyoming's workers' compensation statutes or the Division's rules. He observed that laser treatment is also regarded as experimental by Medicare, Utah's workers' compensation program, Cigna, Aetna, and Blue Cross/Blue Shield of Utah.

[¶10] Dr. Staight further testified that two well-regarded independent physician groups had assessed the technology and various studies related to therapeutic Class III and IV lasers, and both concluded that the evidence to demonstrate the benefits or effectiveness of those devices was insufficient. These groups pointed out the need for methodologically rigorous clinical trials to compare the efficacy of laser therapy to other modes of treatment, and to ascertain the effectiveness of various wavelengths and dosages of laser light. Dr. Staight then detailed his criticisms of the studies Birch relied upon, and concluded that the "jury is still out" on laser therapy due to the "mixed bag of evidence" revealed by independent peer review of existing studies and literature.

[¶11] The hearing examiner ultimately found the Division's evidence more persuasive and upheld its determination to deny Birch reimbursement for his travel expenses for his Utah treatment because he could have obtained comparable chiropractic treatment in Wyoming, and because chiropractic use of cold lasers is experimental and investigatory. The district court affirmed.

## STANDARD OF REVIEW

[¶12]         In an appeal from a district court's review of an administrative decision, this Court reviews the case as if it had come directly from the administrative body, affording no special deference to the district court's decision. *Stallman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 28, ¶ 27, 297 P.3d 82, 89 (Wyo. 2013); *Deloge v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 154, ¶ 5, 264 P.3d 28, 30 (Wyo. 2011). In accordance with Wyo. Stat. Ann. § 16-3-114(c)(ii)(E) (LexisNexis 2013), we review an agency's findings of fact by applying the substantial evidence

4

standard. *Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 8, 301 P.3d 137, 141 (Wyo. 2013); *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Jacobs*, ¶ 8, 301 P.3d at 141; *Bush v. State ex rel. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005). "Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo. 2011).

Where a hearing examiner determines that a claimant has failed to carry her burden of proof, this Court must decide whether that determination was contrary to the overwhelming weight of the evidence. *Jacobs*, ¶ 8, 301 P.3d at 141; *Hoffman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 164, ¶ 7, 291 P.3d 297, 301 (Wyo. 2012). We defer to the agency's (or the hearing examiner's) determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence. *Willey v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2012 WY 144, ¶ 20, 288 P.3d 418, 427 (Wyo. 2012) (quoting *Beall v. Sky Blue Enters.*, 2012 WY 38, ¶ 28, 271 P.3d 1022, 1034 (Wyo. 2012)).

We apply the arbitrary and capricious standard of review as a "safety net" to catch agency action which prejudices a party's substantial rights or is contrary to other standards of review under Wyoming's Administrative Procedures Act, but which is not easily categorized or subject to a particular standard. *Jacobs*, ¶ 9, 301 P.3d at 141. "The arbitrary and capricious standard applies if the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law." *Id*. "We review an agency's conclusions of law *de novo*, and will affirm only if the agency's conclusions are in accordance with the law." *Kenyon*, ¶ 13, 247 P.3d at 849.

*Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 95, ¶¶ 17-19, 307 P.3d 835, 840 (Wyo. 2013).

## DISCUSSION

**Legal Standards – Findings of Fact and Substantial Evidence**

[¶13]  Mr. Birch challenges the hearing examiner's determinations that cold laser therapy is experimental and that treatment comparable to that which he received in Utah was available in Wyoming closer to his home in Daniel.  He asserts those determinations were not supported by sufficient factual findings or substantial evidence.  As we recently held:

> We have never held that a hearing examiner's decision must contain findings specifying a decision as to every fact in dispute.  We have only required that such an order contain the basic findings of fact upon which the hearing examiner based his ultimate conclusions relating to "material issues in the proceeding."  [*Exxon Mobil Corp. v. Wyo. Oil & Gas Conservation Comm'n*, 2013 WY 32], ¶ 26, 297 P.3d [782,] 788 [(Wyo. 2013)].  The findings must be sufficient to permit us to determine whether the agency decision was supported by substantial evidence and was otherwise reasonable. *Id.*, ¶ 26, 297 P.3d at 788-89.

*Leavitt*, ¶ 29, 307 P.3d at 842.

[¶14]  With respect to whether substantial evidence supports those findings, we have observed that

> [w]e review to determine whether the record as a whole contains relevant evidence that a reasonable mind might accept as adequate to rationally support the hearing examiner's conclusion. *Jacobs*, ¶ 8, 301 P.3d at 141; *Kenyon*, ¶ 11, 247 P.3d at 849.  Stated another way, this Court must be able to conclude that the agency decision was not contrary to the overwhelming weight of the record evidence as a whole. *Jacobs*, ¶ 8, 301 P.3d at 141; *Hoffman*, ¶ 7, 291 P.3d at 301.  We need not determine that each and every finding of fact had a reasonable evidentiary basis, but only that those necessary to support the decision were so supported.

*Leavitt*, ¶ 32, 307 P.3d at 842.  Moreover,

> [a] hearing examiner is not bound to accept and may disregard testimony[ – even that] which is not contradicted by an opposing expert[ – ] if the circumstances of a case render it

6

less than credible, or if that testimony is evasive, equivocal, confused, "clouded with uncertainty and improbability, or otherwise . . . unreliable or unworthy of belief." *David v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2007 WY 22, ¶ 15, 151 P.3d 280, 290 (Wyo. 2007). In addition, a hearing examiner may disregard a medical expert's opinion if it is unreasonable, inadequately supported by the facts upon which it purportedly rests, or based upon an incomplete or inaccurate medical history. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 118, ¶ 29, 259 P.3d 1161, 1168 (Wyo. 2011).

*Leavitt*, ¶ 21, 307 P.3d at 841.

### *Closer Available Treatment*

[¶15] The Division has limited statutory authority to reimburse claimants for travel expenses related to medical care. The pertinent provisions of Wyo. Stat. Ann. § 27-14-401(d) provide:

> (d) Medical and hospital care[5] shall be obtained if possible within Wyoming, or in an adjoining state if the . . . health care provider in the adjoining state is closer to . . . the usual place of employment of the employee than a . . . health care provider in Wyoming, unless otherwise authorized by the division. Except as otherwise authorized by the division, reimbursements for travel in obtaining medical and hospital care shall not be paid:
>
> . . .
>
> (ii) For travel other than that necessary to obtain the closest available medical or hospital care needed by the employee except in those instances where travel within Wyoming is at a greater distance than travel outside of Wyoming[.]

Wyo. Stat. Ann. § 27-14-401(d) (LexisNexis 2013). This statute is one of the bases upon which the Division denied Mr. Birch's request for reimbursement of his travel expenses to the Utah Spine and Disc Clinic. The nature of Mr. Birch's claim draws us into a discussion of the nature of laser therapy. As explained below, it may be a unique form of

---

[5] "Medical and hospital care" is broadly defined by statute. However, the term applies only to services that are both reasonable and necessary, and it excludes experimental procedures. Wyo. Stat. Ann. § 27-14-102(a)(xii) (LexisNexis 2013). Consequently, no statutory authorization exists for the Division to reimburse a claimant for travel expenses incurred to receive an experimental form of treatment.

therapy, or it may be nothing more than a method of heating tissue to relieve pain. Accordingly, we must turn to the hearing examiner's findings of fact to determine whether they were adequate to support the conclusion that Birch could have obtained similar chiropractic care in Rock Springs, which was closer to his home, and whether those findings were supported by substantial evidence.

[¶16] The hearing examiner found based upon Birch's testimony that some degree of standard chiropractic care could have been obtained in Pinedale, Jackson, Rock Springs, Green River, and Evanston, and that he could have received Class III laser therapy in Rock Springs. All of these cities are closer to Birch's home in Daniel than Murray, Utah. Birch provided this information to the hearing examiner through his Exhibit 5, a letter from a Rock Springs chiropractic clinic. The hearing examiner held that Birch had not carried his burden of persuading him that Class IV lasers are so different from Class III lasers that Birch could not have received laser therapy in Rock Springs that was substantially equivalent to what he received at Utah Spine and Disc Clinic, presumably assuming that such treatment might not be experimental.

[¶17] Birch's testimony and his Exhibit 5 can reasonably be viewed as conceding that standard forms of chiropractic care could be obtained in western Wyoming, particularly in Jackson and Rock Springs, and that Class III laser therapy was available at a chiropractic clinic in Rock Springs. He never disputed the Division's contention that manual chiropractic manipulation or mechanical traction, which he received in Utah along with laser therapy, was available at those Wyoming facilities. The record as a whole therefore reasonably supports the hearing examiner's conclusion that standard modes of chiropractic care were available in Wyoming in cities closer to Daniel than Murray, Utah.

[¶18] As we noted above, the exhibits Birch submitted drew little distinction between the relative efficacy of Class III and Class IV lasers. Only the manufacturer of the laser used on Birch claimed that the light beam of the latter penetrated more deeply than that of the former, but that distinction rested on what appears to be a largely untested hypothesis that therapeutic lasers of all classes create a photo-chemical reaction in tissue. Because that effect remains unproven and hypothetical, the therapeutic value of both classes of lasers is equally experimental at this point. As we also observed above, both Class III and Class IV lasers can also can be viewed as topically heating the body's surface, in turn conducting that heat to underlying tissue, which is what commonly available infrared heat lamps do. There is nothing in the record to suggest that Class IV lasers are more effective than heat lamps.

[¶19] We conclude that the findings are sufficient to permit us to evaluate whether relevant evidence reasonably supports them. We also conclude that the hearing examiner's decision with respect to this issue is not contrary to the overwhelming weight of the evidence as a whole. We therefore agree that Birch did not carry his burden to

demonstrate that he could not have received laser therapy that was substantially equivalent to what he received at Utah Spine and Disc Clinic in Rock Springs.[6]

### *The Experimental Nature of Therapeutic Lasers*

[¶20]   As noted above in footnote 5, the Division is statutorily prohibited from paying for experimental medical procedures and, by extension, from reimbursing travel expenses incurred to obtain experimental treatment.  § 27-14-102(a)(xii).  However, the statute does not define the term "experimental."  The Division's rules more explicitly define the term as follows:

> Experimental care is defined as any device, drug, procedure or test used in the delivery of medical, pharmaceutical, surgical or therapeutic services that are not customary and considered investigational, unusual, controversial and/or obsolete.  The Division will neither authorize nor pay for these services.

Wyo. Dep't of Workforce Services, Rules, Regulations & Fee Schedules, Workers' Comp. Div., ch. 10, § 10.  In *Tarraferro v, State ex rel. Wyoming Medical Commission*, 2005 WY 155, 123 P.3d 912 (Wyo. 2005), this Court also attempted to provide some context for understanding the term by quoting from 1A *Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties* § 2.53 (2001):[7]

> To understand this area of law, it is important to distinguish between concepts that are frequently commingled and confused. Unfortunately, there is no universally accepted terminology, so that it is often difficult to know what any one author means when using the words "experimentation," "research," and "novel technique." For the sake of clarity and understanding, these terms will have the following definitions in this discussion unless stated otherwise.
>
> *Experimentation* is the use of a medicine or procedure, which is yet to be adequately tested for the purpose for which

---

[6] We are not entirely sure that it was necessary for OAH, the district court, or this Court to determine whether Class III laser treatment was shown to be different in some respect from the Class IV therapy Mr. Birch received, because we determine below that laser therapy in general is experimental.  However, we acknowledge that the possible similarity of laser therapy to heat lamp treatment may have required that issue to be addressed due to the availability of the latter service in Wyoming.

[7] This passage may currently be found at 1 Richard M. Patterson, *Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties* § 2:53 (6th ed. 2013).

it is intended. An experiment may or may not have a therapeutic goal, and it may or may not be designed to yield useful scientific information. Thus, "experimentation" has a very broad definition. In the legal and medical literature, "experimentation" is used to mean everything from the malicious use of patients as guinea pigs to the noble treatment of an incurable patient by the most scientifically advanced methods.

*Research* is a form of "experimentation" that includes only studies designed to produce useful scientific data. A research project may or may not offer therapeutic benefits to the human subjects involved, but it is always designed to obtain information beneficial to humankind in general.

*Novel techniques*, on the other hand, are always intended to be therapeutic or diagnostic, relative to a particular patient's medical problem. Like experimentation, novel techniques have varying degrees of incomplete prior testing. The categories of novel techniques may be divided into (1) new approaches to otherwise untreatable conditions and (2) new approaches to treatable conditions (where it is hoped that the new technique will offer some new advantage).

*Tarreferro*, ¶ 17, 123 P.3d at 919-20.

[¶21]  The word "experimental" and similar phrases are terms of art describing a medical procedure or service that has not been adequately tested or shown to be useful for a particular treatment purpose.  That is, the regularity of the benefits a practitioner hopes to achieve with the procedure in question has not yet been subjected to sufficiently rigorous trials to make it an accepted form of treatment among healers practicing in a relevant specialty.  *See Tarreferro,* ¶ 18, 123 P.3d at 920.  *See also* 12 Steven Plitt et al., *Couch on Insurance* § 181:4 (3d ed. updated 2013) (an experimental or investigative procedure is one whose effectiveness with respect to a specific condition has not been commonly accepted as proven by the medical profession, or one that is still in the trial stage).[8]  Similarly, the American Medical Association's Diagnostic and Therapeutic Technology Assessment program has defined procedures as experimental or investigational when

---

[8] Clinical trials usually consist of three stages:  initial testing to determine the feasibility of an experiment; relatively small, usually non-randomized studies to determine whether the treatment has any observable effect in patients; and randomized clinical trials where the efficacy of the experimental treatment on a group of patients is compared to that of a control group of subjects who receive conventional, non-experimental treatment.  12 Plitt, *supra,* § 181:5 n.51.

"there is no consensus on the (a) safety or (b) effectiveness of this technology to date, there is insufficient evidence to determine its appropriateness, or it warrants further study; use of this technology for the given indication in the specified patient population should be confined largely to research protocols."  Julia Field Costich, Note, *Denial of Coverage for "Experimental" Medical Procedures: The Problem of De Novo Review Under ERISA*, 79 Ky. L.J. 801, 807 & n.43 (1990-1991).

[¶22] With these definitions in mind, we examine the sufficiency of the hearing examiner's findings relating to the experimental nature of therapeutic lasers (to the extent they are alleged to provide benefits greater than that achieved by the use of heat lamps[9]) and whether those findings are supported by sufficient evidence.

[¶23] The hearing examiner first explored Dr. Luddington's testimony concerning the mechanism by which the laser might treat pain.  He claimed the laser did not heat the targeted tissue like an ultrasound machine would, but that the light generated by the cold laser produced a chemical change in the cells of the targeted tissue, thus relieving pain.  The hearing examiner also considered Dr. Luddington's position that FDA approval of the laser with which he treated Mr. Birch meant that it should no longer be considered experimental, when the record in fact showed that FDA approval was based on its finding that the laser was similar to a heat lamp.

[¶24] Moreover, as noted above, the literature Birch submitted tended to show that therapeutic lasers are in fact still experimental, contrary to Dr. Luddington's deposition testimony.  For example, the author of Exhibit 10, relating to the treatment of facial nerves of rats with lasers, formulated a theory that the light generated by the laser changes nerve cell chemistry, but admitted that this theory is hypothetical and in need of further study.  Exhibit 7, a statistical analysis of sixteen clinical studies using lasers to treat neck pain, noted that the medical research community remains skeptical and unable to make firm conclusions about the "mechanism of action and effectiveness" of therapeutic lasers due to insufficient data or conflicting findings.  Exhibit 8 was a small study in which some patients with lower back pain were treated with chiropractic manipulation and exercise therapy, and others with similar complaints received Class IV laser therapy in addition to manipulation and exercise.  The second group self-reported greater pain reduction than the first, but the author conceded that further study was required to validate those provisional results.

[¶25]  On the other hand, Dr. Staight testified by deposition that a number of insurers and the Division's chiropractic advisory panel consider the use of Class IV lasers still to be

---

[9] For reasons discussed above, we confine our inquiry because, if Class III and Class IV therapeutic lasers are functionally nothing more than heat lamps in the eyes of the research and medical communities, the compensability of Birch's travel expenses to Utah turns on the availability of a closer heat lamp, not on whether the claims of Utah Spine and Disc regarding its laser constitute an experimental use of that machine.

11

experimental. He also concluded, after reviewing relevant literature and research, that the laser therapy offered by Utah Spine and Disc Clinic was experimental under the definition found in the Division's rules. Dr. Staight also testified—and provided an article supporting that testimony—that FDA approval of the laser used on Birch meant only that it was safe, not that it was effective.

[¶26] The hearing examiner ultimately found Dr. Staight to be a more credible and reliable witness than Dr. Luddington. While the former's testimony was straightforward, logical, and focused, the latter was confusing and reflected no clear understanding of how or why the laser would promote healing. Although Dr. Luddington's explanation relied heavily on promotional materials provided by the manufacturer of the laser, those materials were inconsistent with the manufacturer's claims to the FDA that the device was simply used to provide topical heating. Furthermore, Dr. Luddington's assertion that the sort of laser treatment provided to Mr. Birch was not experimental was at odds with his admission that Utah Spine and Disc would not bill insurance companies or workers' compensation authorities for such treatment because those entities consider it to be experimental. In addition, none of the literature that Birch relied upon explicitly found the use of therapeutic lasers not to be experimental.

[¶27] We conclude that the hearing examiner's order sets out adequate findings of fact, and that they sufficiently direct us to evidence from which we can discern whether there is a reasonable basis for them. The hearing examiner's decision regarding the experimental nature of cold laser therapy was therefore supported by substantial evidence and not contrary to law, as he correctly, and consistently with *Tarraferro*, interpreted the term "experimental" as it applies to cold laser therapy.

**Proration of Travel Expenses**

[¶28] Mr. Birch concedes that he asked for reimbursement of what he spent traveling to Utah, where he received manual chiropractic manipulation and mechanical traction for back pain, and likewise concedes that similar services were available in Rock Springs. He now invokes de novo review by this Court, alleging that § 27-14-401(d), which is quoted in ¶ 15, requires the hearing examiner to reimburse him for the portion of his Utah travel expenses that he would have paid if he had instead gone to Rock Springs for treatment.

[¶29] In interpreting statutes, this Court first looks to see if the legislature's intent can be ascertained in the ordinary and obvious meaning of the words employed when read together as a whole, giving full consideration to their arrangement and connection, and giving effect to every word, clause, and sentence. We need go no further if the statute is unambiguous; that is, if reasonable persons are able to agree to its meaning consistently and predictably. *Bourke v. Grey Wolf Drilling Co., LP*, 2013 WY 93, ¶ 19, 305 P.3d 1164, 1168-69 (Wyo. 2013).

12

[¶30] The statute expresses a preference that medical care be obtained in Wyoming and/or at an appropriate facility closest to an employee's home. Reimbursement for travel expenses is permitted only to the extent that one actually travels to such a site and receives treatment. Birch's interpretation would read the expressed preference and its corollary effect on travel reimbursement out of the statute. In effect, he would have the Division pay for a trip he did not make to a place where he received no treatment. The unambiguous language of the legislature was not intended to countenance, much less to require, such a result.

## CONCLUSION

[¶31] The hearing examiner did not err in his interpretation of the applicable Wyoming statutes. His decision contained adequate findings of fact, and those findings were supported by substantial record evidence. We therefore affirm the district court's order upholding the OAH decision.