# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 121

APRIL TERM, A.D. 2014

*September 24, 2014*

MERLIN H. ZOWADA and LORI
ZOWADA,

Appellants
(Petitioners)

v.                                              S-13-0282

MULLINAX CONCRETE SERVICE
COMPANY, INC.,

Appellee
(Respondent).

*W.R.A.P. 12.09(b) Certification*
*from the District Court of Sheridan County*
*The Honorable William J. Edelman, Judge*

*Representing Appellants:*
> H. W. Rasmussen, Attorneys at Law of Wyoming, P.C., Sheridan, Wyoming

*Representing Appellee:*
> Anthony T. Wendtland of Wendtland & Wendtland, LLP, Sheridan, Wyoming

*Before BURKE, C.J., and HILL, KITE\*, DAVIS, and FOX, JJ.*

*\* Chief Justice at time of oral argument*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]   Sheridan County landowners Merlin and Lori Zowada petitioned the Board of County Commissioners[1] to establish a private road to access their landlocked tract through property belonging to Mullinax Concrete Service Company.  The Board's first ruling in the case came before this Court in *Mullinax Concrete Service Co. v. Zowada*, 2010 WY 146, 243 P.3d 181 (Wyo. 2010) (*Mullinax I).*[2]  We remanded to the district court with a mandate to direct the commissioners to compare the relative merits of only two alternative routes, and to determine whether the greater cost of one of the routes was justified.  After further proceedings, the Board again established the road on a route not favored by the Zowadas, who challenge the ruling in this appeal.   We accepted certification from the district court, and we affirm.

## ISSUES

[¶2]   The Zowadas raise two issues relating to Mullinax's construction of a stormwater collection facility on the route sought by the Zowadas and Mullinax's evaluation of the costs of constructing and maintaining a road on the route selected by the Board.  We restate those issues as follows:

    1.  Should the Board have excluded certain facts as irrelevant because they relate to events that did not take place until after the Board received the viewers and appraisers[3] report and held its first contested case hearing in 2007?

    2.  Were the Board's findings supported by substantial evidence?

## FACTS

[¶3]   The Zowadas filed their petition on January 31, 2006.  The Board appointed two sets of viewers and appraisers who considered six alternative routes for the private road, only two of which now remain in contention.  They have come to be known as Route 1, championed by the Zowadas, and Route 6, the path the Board has now chosen twice.  *See*

---

[1] The governing statutes, Wyo. Stat. Ann. §§ 24-9-101 and 103 (LexisNexis 2005), have been amended several times since the Zowadas filed their petition, and jurisdiction over these actions now lies with the district courts rather than boards of county commissioners.

[2] The parties returned to the Court a second time in *Mullinax Concrete Service Co. v. Zowada*, 2012 WY 55, 275 P.3d 474 (Wyo. 2012) (*Mullinax II*).  In that appeal, we determined that an amended statute for establishment of private roads did not apply retroactively to this case.  *Id.*, ¶ 11, 275 P.3d at 477. *Mullinax II* is not pertinent to the issues in this third appeal.

[3] Pursuant to Wyo. Stat. Ann. § 24-9-101(h), three disinterested persons must be appointed to view the subject properties and proposed road locations, evaluate any damages to be suffered by the owner of the burdened property, and recommend to the decision maker the most reasonable and convenient route for the private road.

1

*Mullinax I*, ¶¶ 5-11, 243 P.3d at 183-85. The following is an aerial view of the general area and the original six proposed routes:



*Mullinex I,* Appendix B.

[¶4]     As the map shows, Route 1 proceeds north to the Zowadas' land from Fort McKenzie Road, Wyoming Highway 337. It crosses the narrow eastern end of Mullinax's roughly triangular property along its approximately 168-foot boundary with property housing a warehouse owned by Big Horn Beverage, Incorporated.

[¶5]     Route 6 begins on Highway 337 approximately 1,500 feet west of Route 1, proceeds north on Industrial Road for roughly 1,200 feet until it crosses an unused railroad bed that parallels what was the northern border of Mullinax's property, and then proceeds to the southeast for nearly another 1,200 feet to the western border of the Zowadas' land. In other words, one driving west on Highway 337 heading for Route 6 would pass Route 1, travel a significant distance west, then north, and then double back east to the Zowada property. Route 1 is, of course, considerably shorter than Route 6.

[¶6]     After the Board's November 2007 contested case hearing, but before it issued its findings of fact and conclusions of law in December 2008, Mullinax advised that it had purchased land abutting what had been the northern boundary of its property and extending north of the railroad right-of-way. *Mullinax I*, ¶ 12, 243 P.3d at 185. Mullinax's previous lack of a legal interest in that land had profoundly affected the evaluation of Route 6 by both sets of viewers and appraisers.

[¶7]     The first group of viewers and appraisers recognized that the Wyoming Department of Environmental Quality (DEQ) had mandated that Mullinax devise a plan

to keep sediment-laden stormwater from draining off its property to nearby Goose Creek, and that an engineering study commissioned by Mullinax concluded that the best solution required placing a structure at the northern end of Route 1. Because there was no equally well-engineered alternative for stormwater control, the first set of viewers and appraisers rejected Route 1. They ultimately selected a problematic variation of Route 6. Aware that no right-of-way then existed north of the Mullinax property line, and therefore concluding that a road paralleling the old rail line would require condemnation of another's land, they suggested locating Route 6 on the bed of the old rail line.

[¶8] The Board rejected the report because it concluded that the viewers and appraisers had failed to follow instructions, and it then appointed a new group of viewers and appraisers. *Mullinax I*, ¶ 9, 243 P.3d at 184. The new group rejected Route 6 because it would require obtaining an easement through the land that Mullinax purchased nearly six months later, and because at the time it could not be determined how long it would take to negotiate an easement or its cost. They chose Route 1, dismissing the contents of the design report relating to the stormwater containment pond with the conclusory statement that they felt "there are alternative locations for this type of facility which would serve as well." *Id.*, ¶ 10, 243 P.3d at 185.

[¶9] In light of Mullinax's intervening purchase of the land needed to construct the final leg of Route 6, the Board rejected the recommendation of the second group of viewers and appraisers. It concluded that although they had properly calculated the loss in value of Mullinax's property attributable solely to the amount of land set aside for Route 1, Mullinax was also entitled to compensation for the loss of the additional land it would have to dedicate to stormwater containment if it could not place its sediment containment pond at the northern end of Route 1. It also noted that Mullinax should be compensated for the difference in construction costs between its planned method of remedying its stormwater problem and suggested alternatives that would permit the use of Route 1. *Id.*, ¶ 12, 243 P.3d at 186-88.

[¶10] Although the Board relied on admittedly imprecise evidence as to the costs of constructing the drainage control alternatives and of building a road on Route 6, it determined that the costs associated with each route were comparable. The Board also found that the value of resolving Mullinax's stormwater problems as it planned to do offset any compensation which might be due for the Zowadas' use of Route 6. Consequently, the Board declared that route the most reasonable and convenient to both parties, awarded no damages to Mullinax for Zowadas' use of it, and required Zowadas to pay for the engineering and construction of the roadway between Industrial Road and the Zowada property. *Id.*

[¶11] Both parties filed petitions for review by the district court. The Zowadas claimed that the Board's selection of Route 6 was not supported by substantial evidence, and Mullinax claimed that the Board applied an incorrect standard in determining the

3

damages and compensation due to it. The court agreed with the Zowadas because it concluded that the Board had not resolved whether the BNSF Railroad would permit users of the road to cross its right-of-way as required for Route 6, had not addressed the concerns of the first group of viewers and appraisers regarding the topographic challenges presented by that route, had ignored the comment in the second viewers' and appraisers' report that Mullinax's sediment retention pond could be located in some area other than Route 1, and had not explained why it thought Route 6 was more reasonable and convenient than Route 1. The district court also agreed with Mullinax that the Board's damage award was erroneous. *Id.,* ¶¶ 13-15, 243 P.3d at 188-89.

[¶12] The district court consequently reversed and remanded the case to the Board, and ordered it to reassemble the viewers and appraisers and to assess the damages for all possible road locations. Those damages were to be calculated as of the date of the viewing of the affected real properties, using an assessment of the values of those properties before and after burdening them with a private road. In addition, the court directed the Board to determine whether BNSF consented to the selected crossing, explain why the Board considered the selected route reasonable and convenient, and if building a road along any other route would cost more than Route 1, explain why those costs would be justified. *Id.,* ¶ 15, 243 P.3d at 189. Mullinax then sought further review in this Court.

[¶13] In many ways we agreed with the district court. We first observed that the Board was obligated to compare the costs and benefits of the two options to the parties' competing interests with greater specificity to determine which of the two contested routes was more reasonable and convenient. We also noted that the record was inadequate to allow it to do so. The anticipated cost of building the road on Route 6 was a mere "guestimate," and not a formal contractor's estimate. Moreover, the Board failed to address the viability and costs of suggested alternatives to Mullinax's stormwater control plan. Finally, we concluded that Mullinax was entitled to damages for the decrease in value of the land it had purchased from its northern neighbor, and that this diminution in value was to be determined before and after being burdened by Route 6. *Id.,* ¶¶ 18-22, 243 P.3d at 191-92.

[¶14] This Court determined that the case should be remanded to the Board, but we modified the instructions given by the district court in its order of remand. We concluded that the Board only needed to compare the relative merits of Routes 1 and 6. If the Board chose Route 6, it also had to justify the greater cost of that road and obtain a before and after appraisal of the extent to which the burden of the road would diminish the value of Mullinax's land. *Id.,* ¶ 23, 243 P.3d at 192. However, we also concluded that BNSF would allow users of the road to cross the BNSF right-of-way. *Id.,* ¶¶ 5, 10, 243 P.3d at 183, 85. Finally, we indicated that the Board could take additional evidence on remand, but found that it did not necessarily need to appoint viewers and appraisers. *Id.,* ¶ 23, 243 P.3d at 192.

4

[¶15]  After remand, the Board took additional testimony and evidence on October 9, 2012, and it issued Findings of Fact and Conclusions of Law on September 17, 2013.  We will summarize those findings and conclusions here, but we will analyze the supporting evidence in detail in our discussion of Zowadas' claims, and then only to the extent necessary to address those claims.

[¶16]  Among the first of the matters addressed by the Board was a significant development that occurred prior to the hearing on remand—Mullinax's construction of its planned retention pond on the northern end of Route 1.  At about the same time as the November 2007 contested case hearing, Mullinax received its second DEQ notice of violation in a year.  Although the DEQ had been lenient in enforcing its stormwater and sediment control requirements out of consideration for the ongoing dispute between Mullinax and the Zowadas, its communications regarding remediation reflected an increasing sense of urgency.  After the December 2008 release of a favorable decision by the Board, Mullinax assured the DEQ that it would immediately resolve the stormwater problem.  It built the pond and accompanying drainage structures between December 31, 2008, and January 13, 2009, at a cost of $23,799.  The Board determined that Mullinax undertook that construction at its own risk.

[¶17]  The Board found that Mullinax placed the pond at the lowest point on its land, in an area that serves as a natural drainage terminus for the entire property, and which allows surface water to be easily directed to the pond.  Sediment carried by the water settles in the pond, and the water is disposed of by absorption into the ground and evaporation.  Mullinax removes the sediment which accumulates twice a year, trucking away approximately 120 tons—enough to fill eight fifteen-ton capacity dump trucks— each time.  Since the pond was built, DEQ had inspected it twice and found that it complied with relevant surface water regulations.

[¶18]  Based on the testimony at the 2012 hearing, the Board found that the 2007 viewers and appraisers had wrongly concluded that Mullinax could use alternate locations and methods for handling surface water sediment that would be roughly equivalent to the existing pond in terms of cost and effectiveness.  It then reviewed the eight alternative stormwater collection methods suggested by Zowadas' witnesses.[4]

[¶19]  The Board eliminated the second, fourth, fifth, and eighth options because they required Mullinax to pipe collected storm water across the Zowadas' property, and the Zowadas were unwilling to grant Mullinax an easement for that purpose.  The Board also

---

[4] Although these witnesses were engineers, the options they presented cannot be called "designs" based on surveying and measurements done on site, taking into account how Mullinax's business operated day to day and the underground and surface features of the property.  Rather, the options were presented as mere "concepts" produced after briefly visiting the site, and the costs associated with them were quite rough and included no adjustments for the disruption of Mullinax's business during their construction.

eliminated the seventh option, bridging the existing sedimentation pond, because cost estimates to do so ranged from $100,000 to over $220,000.

[¶20] Of the remaining alternatives, the first option involved relocating the sedimentation pond to the southern edge of Mullinax's property where it would be sandwiched lengthwise between the east entrance proposed for Route 1 and Mullinax's existing truck scales. That option also required a large catch basin between Route 1 and Mullinax's retail store, from which water would be channeled through pipes to the sedimentation pond. Building that option, including removal of portions of an eight to ten inch thick concrete pad, would cost Mullinax approximately $27,000 to $35,000 more than it cost to build the existing pond.[5] There would also be costs resulting from placing the new pond over an area that contained utilities running from just south of the Mullinax property line to structures on the property.

[¶21] The third option involved removing a substantially greater amount of concrete to build a fifty-foot-wide detention basin extending eighty feet to the north of the southern boundary of the Mullinax property. The basin was to be filled with rock and coarse gravel. Like the first option, this alternative would likely impinge on utilities running from the street to buildings on Mullinax property, and it could require relocating the truck scales to the west. The total cost of constructing this option would exceed the cost of the existing pond by $35,000 to $42,000.

[¶22] The sixth option involved building a series of catch basins and drop inlets connected by perforated pipe which would empty into the existing pond. The pond would be filled with rock and coarse gravel, and the structures leading to it would allegedly slow the flow of stormwater, allowing it to partially infiltrate the ground and settle sediment from the water that reached the pond. Those structures were to be built south of Mullinax's retail store and north of its scale and office facilities and its concrete batch plant. The cost of this option was estimated at $30,000 to $45,000 more than the cost of the existing pond.

[¶23] The Board then evaluated the loss that Mullinax would suffer by virtue of selecting Route 1 or Route 6. It determined that Mullinax's partial loss of the land underlying Route 1 should be valued at $4,500. To that it added the damages that would be suffered as a result of forcing Mullinax to use land outside Route 1 to manage stormwater, and the limitations that placed on use of the land. The Board calculated those damages by deducting what it cost Mullinax to build its sediment collection pond from what it would cost to construct the three options discussed above. Taking the least expensive option, it found that the additional cost to Mullinax would be $30,000 and that the total damages attributable to Route 1 would be $35,000.

---

[5] The Board accounted for the risk taken by Mullinax in building that pond while litigation was still ongoing by deducting the cost of that facility from the total cost of pursuing each alternative option.

[¶24] In evaluating the damages that would result from selecting Route 6, the Board observed that shortly after its November 2007 hearing, Mullinax purchased the land that would contain Route 6 in an arm's-length transaction for $20,000 per acre. It then calculated how much of that property would be required to build that route, and it determined that Mullinax would suffer $6,500 in damages from Zowadas' use of Route 6.

[¶25] In light of the greater damage to Mullinax's property if Route 1 was selected, as well as Mullinax's assertion that it would build the road necessary to use Route 6 at its own cost and for no more than $50,000, the Board selected Route 6 as the more reasonable and convenient choice. The Zowadas timely sought review of that decision, and we accepted direct certification from the district court under Wyoming Rule of Appellate Procedure 12.09(b).

## DISCUSSION

### Evidentiary Issues

[¶26] Decisions concerning admission or rejection of evidence are reviewed for an abuse of discretion, and we will not interfere with the hearing officer or agency's decision unless it is so unreasonable as to shock the conscience and appears to be so unfair and inequitable that a reasonable person could not tolerate it. *Johnson v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2014 WY 33, ¶ 14, 321 P.3d 318, 322 (Wyo. 2014). Administrative agency hearing officers are not bound by the technical rules of evidence that govern judicial proceedings. *Watkins v. State ex rel. Wyoming Medical Comm'n*, 2011 WY 49, ¶ 21, 250 P.3d 1082, 1089 (Wyo. 2011). Instead, they are to be guided by the standards articulated in Wyo. Stat. Ann. § 16-3-108(a) (LexisNexis 2013). *Johnson*, ¶ 16, 321 P.3d at 322. That statute requires the exclusion of evidence only if it is irrelevant, immaterial, or unduly repetitious. Wyo. Stat. Ann. § 16-3-108(a).

[¶27] Although the Wyoming Rules of Evidence do not apply to administrative proceedings, the definition of relevance contained in them is instructive. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401.

[¶28] The Zowadas assert that the hearing officer abused his discretion in admitting evidence proving that the sediment retention pond at the northern end of Route 1 had been built after the November 2007 hearing. They also challenge the hearing officer's admission of Nathan Mullinax's sworn testimony that his company could and would build the road necessary for the use of Route 6 for $50,000.

7

[¶29] They first contend that such evidence was inadmissible because, in the first appeal relating to this case, they understood this Court to have remanded with instructions that the Board was not to consider events after the second set of viewers and appraisers viewed the Mullinax property. That reading of our earlier opinion is incorrect. As the Zowadas suggest, this Court did agree with the district court that the Board needed to assess the damages relating to the selection of Route 6 by considering evidence that compared the market value of the parcel purchased by Mullinax both with and without the burden of the proposed Route 6. We did not alter the district court's direction that the appraisal of those market values relate to the worth of the property at roughly the time it was viewed. However, the Zowadas treat that "view" as the one which occurred in late 2007 and, in doing so, ignore the district court's direction to conduct an appraisal on remand comparing the before and after damages. *Mullinax I*, ¶¶ 15, 20, 243 P.3d at 189, 191. Neither this Court nor the district court restricted the Board to facts existing in 2007, and to have done so would have been unrealistic at best.

[¶30] The Zowadas also contend that the hearing officer should not have admitted the challenged evidence because it was irrelevant and, with respect to the evidence relating to the cost of road building on Route 6, because it was not credible. We can dispose of the second of those contentions summarily, because challenges to the credibility of testimony go to its weight, not to its admissibility. *Easum v. Miller*, 2004 WY 73, ¶ 33, 92 P.3d 794, 803 (Wyo. 2004); *Robinson v. State*, 11 P.3d 361, 374 (Wyo. 2000). As to the first contention, the record shows that evidence as to the construction and operation of the sediment retention pond and the costs of building a road on Route 6 was definitely relevant to the issues before the Board.

[¶31] The evidence relating to the pond demonstrated that: (1) it was built to an engineer's design specifications; (2) it was built for $23,799; (3) it worked as designed; (4) it captured approximately 240 tons of sediment each year; and (5) Mullinax could remove the sediment for disposal with little interruption of its business. The Zowadas did not produce evidence of comparable quality on those points with respect to its first, third, and sixth proposed options for sediment control.

[¶32] The two engineers who testified for the Zowadas had not designed any alternatives to Mullinax's pond. They had not surveyed or taken any measurements from which they could calculate what was required for a workable system. They did not know how much sediment ordinarily drained off the property, or the volume of traffic that ordinarily travelled through the scales and the area between the scales and Mullinax's retail store, where Route 1 would have been located.

[¶33] Consequently, they were uncertain what their "concepts" would cost and whether any hidden costs, such as dealing with utilities and sewer lines, might add to the price. It was equally unclear whether those alternatives would actually work; that is, whether they would accomplish the task as the existing pond does, or how costly they would be to

maintain, both from the standpoints of time and equipment expenses and disruption of Mullinax's business.

[¶34] The Board had to determine how the parties would be left if it chose one of Zowadas' proposed options. The evidence challenged by the Zowadas was relevant because it showed that the already-built pond was more efficient and cost-effective than the three proposed alternatives.

[¶35] Nathan Mullinax's testimony regarding the cost of constructing the road on Route 6 was also relevant for similar reasons. It made it more probable that choosing that route and allowing Mullinax continued use of its pond would more effectively, reasonably, and fairly balance the parties' competing interests in cost and convenience.

[¶36] That testimony showed that Mullinax had already paid an engineer to survey the route and design the road to be built on Route 6 at its own expense. Those expenses were to be levied upon the Zowadas in the 2008 Board decision. The design work showed that building a road along that route was feasible. To assure compliance with the clean air standards applicable to its operations, Mullinax preferred to assume the duty and cost of maintaining the road once it was built, rather than attempting to require Zowadas to pay part of those expenses as they had been required to do by the 2008 ruling.

[¶37] Most importantly, the evidence revealed that Mullinax could and would build the road for its own cost, thereby providing a fixed price for the road which approximated the more speculative and less certain estimates of the cost of building an alternative drainage control system on Mullinax's property. The Zowadas do not dispute that Mullinax has the experience and equipment necessary to build the road in question.[6]

[¶38] To summarize, admission of the evidence challenged by the Zowadas did not violate any portion of this Court's prior mandate in this case, and that evidence was relevant to issues that the Board had to resolve in order to rationally and justly decide the case. Consequently, we affirm the hearing officer's rulings in these regards.

**Substantial Evidence**

[¶39] The Board was statutorily obligated to determine which route would be the most reasonable and convenient to both Mullinax and the Zowadas, giving full consideration to which would least damage Mullinax's use of its lands. Wyo. Stat. Ann. §§ 24-9-101(h)

---

[6] The Zowadas also argue that we should not consider Mullinax's agreement to build the road for $50,000 because it is a settlement offer under Wyoming Rule of Evidence 408. We disagree. Mullinax assumed responsibility to build and maintain the road, which is sensible in light of the fact that it will use the road for its operations. The Board based its decision on that assumption of responsibility, and if Mullinax fails to build the road as promised, another alternative will be chosen. This was not an effort to compromise a claim.

and 103(a) (LexisNexis 2005). The latter necessarily involved weighing how the selection of Route 1 would affect the costs of Mullinax's efforts to comply with DEQ requirements. The Zowadas now argue that the Boards' resolution of these questions was not supported by substantial evidence.

[¶40] We review an agency's findings of fact by applying the substantial evidence standard required by Wyo. Stat. Ann. § 16-3-114(c)(ii)(E) (LexisNexis 2013). We have defined substantial evidence as relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and have held that an agency's factual findings are supported by substantial evidence if we can discern a rational premise for those findings from evidence in the record. In making that determination, we defer to the agency's (or the hearing examiner's) determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence. *Birch v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2014 WY 31, ¶ 12, 319 P.3d 901, 906 (Wyo. 2014). This Court must be able to conclude that the agency decision was not contrary to the overwhelming weight of the evidence as a whole, considering the extent to which testimony from one party or another may be confused, uncertain, improbable, marked by incomplete or inaccurate knowledge, or otherwise unreliable. *Id.*, ¶ 14, 319 P.3d at 907.

[¶41] As we noted above, the evidence introduced by Mullinax on key matters possessed the virtue of certainty. They indicated they would build the road on Route 6 for a maximum of $50,000, and the Board obviously found that statement to be credible, for it incorporated it as a fact in its final order. Mullinax also established the cost of building its sediment retention pond, that the pond worked, and that it was capable of capturing approximately 240 tons of sediment each year.

[¶42] As also noted above, the evidence presented by Zowadas was not nearly so definite as to the cost and viability of the alternatives it proposed for controlling stormwater on Mullinax's land. The Board could legitimately conclude that those alternatives were nothing more than vague concepts hatched after a few hours spent on the land without taking critical measurements, surveying to determine gradients, or researching the possibility that underground structures or business traffic on the site might adversely affect their cost and utility. In short, the expert witness who advanced those alternatives provided cost estimates that the Board could reasonably view as speculative.

[¶43] As discussed earlier, the expert estimated that the cost of the first option would exceed the cost of Mullinax's pond by $27,000 to $35,000. However, he was unaware that the new pond required by that option was located over a utility easement and sewage pipes servicing buildings on Mullinax's property, and he did not account for any additional costs that would be incurred in dealing with those obstructions. Nor did he account for any costs associated with the fact that the new pond was to be situated between Mullinax's truck scales and the southeast entrance to its property. He offered no

testimony how that location might adversely affect the ability to use the scales and entryway during or after the new pond's construction.

[¶44]  Furthermore, Mullinax's witnesses testified that the proposed catch basin to feed the new pond was not located where it could best capture stormwater.  One testified that much additional concrete work would be required to redirect water to the catch basin, and that Mullinax would have to build those structures in the middle of the area with the highest vehicle traffic.

[¶45]  The Zowadas' expert engineering witness estimated that the cost of the third option would exceed the cost of Mullinax's pond by $35,000 to $42,000.  That estimate failed to account for dealing with the sewer lines servicing Mullinax's buildings, or for the costs associated with Mullinax's simultaneous efforts to conduct its business and construct the large pond required by the third option in the area of its plant with the highest level of traffic.[7]  Furthermore, that pond was four times the size of the one built by Mullinax, yet the Zowadas' witness testified it would cost the same amount to build, which undoubtedly seemed as improbable to the Board as it does to us.

[¶46]  Mullinax's experts even called the functionality of the pond in the third option into question themselves.  They were concerned that even though it would be much larger than the existing pond, it was to be filled with rock and coarse gravel.  The record is not clear on this point, but one assumes this would be necessary to permit heavy truck traffic to cross the pond.  Whether the pond would function effectively when filled with solid rock was never addressed.  On the other hand, two of Mullinax's witnesses testified that the rock-filled pond would quickly fill with sediment, and one of the Zowadas' experts— the "designer" of all the alternative options—agreed and noted that, once filled with sediment, the pond would no longer work.  He suggested no method by which Mullinax could remove the sediment, and he gave no estimate of the costs of doing so or how often the pond would need to be cleaned out, if it could even be done.

[¶47]  The Zowadas' expert estimated that the sixth option would exceed the cost of the existing pond by $30,000 to $45,000.  It called for the construction of a series of small sediment-capturing structures, each of which would drain through similar downhill

---

[7] Approximately two months after the 2012 contested case hearing, the Board convened a public meeting to discuss and vote on the resolution of this case.  Chief among the concerns expressed by the board members was the traffic issue raised by a traffic-flow analysis completed for Mullinax by an engineering firm in 2006 and Mullinax's report of traffic flowing across its scale and through its southeast gate during five months in 2006 and 2007.  The latter showed that, excluding the vehicles of employees and retail sales customers, 52 vehicles per day passed in and out of the scales and 94 per day passed in and out of the gate.  The great majority of those vehicles on one of each trip carried a gross weight of between 53,000 and 85,000 pounds.  In the minds of the board members, that amount and type of traffic, when combined with the additional traffic that would patronize the Zowadas' business presented an excessive safety risk that would be cured by the selection of Route 6.

structures to the existing pond, which was also to be filled with rock and gravel. As was the case with the first option, Mullinax's witnesses testified that this alternative was not located so as to take advantage of the natural drainage on the site. And as with the third option, they concluded that the rock and gravel-filled pond would fill too quickly with sediment to remain workable. In short, the sixth option would use the existing pond and allow the use of Route 1, but the Board could rationally conclude that it would cost nearly twice again what the existing pond cost, be considerably less effective, have an extremely short useful life, and carry presumably much greater clean-out costs that could entail reexcavation of the pond on Route 1—if the sediment it contained could be removed at all.

[¶48] After reviewing the record and considering the uncertainties inherent in the choice of Route 1, we conclude that the Board's selection of Route 6 was not contrary to the overwhelming weight of the evidence. When the Zowadas' evidence or lack thereof is compared to that presented by Mullinax, we conclude that the Board reasonably determined that Route 6 was the most reasonable, convenient, and cost-effective option for both parties.

## CONCLUSION

[¶49] The evidence challenged by the Zowadas was properly admitted at the contested case hearing in 2012, and the Board's decision to establish the private road along Route 6 was supported by substantial evidence. We therefore affirm the Board's Findings of Fact and Conclusions of Law.